## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **CLARK S. CHENEY,** |
| **Plaintiff,** |
| **v.** |
| **IPD ANALYTICS, LLC, et al.,** |
| **Defendants.** |

**Civil Action No.  08-1044 (JDB)**

### <u>MEMORANDUM OPINION</u>

Plaintiff Clark Cheney brings this action against his former employer IPD Analytics, LLC ("IPD" or "the Company"), its chief executive officer, Howard Krass, and the principal shareholder Intellectual Property Development, Inc. (collectively, "defendants") in the wake of the termination of his employment with IPD.  The core of the action is a non-competition provision in Cheney's employment contract with IPD.  Cheney has filed a motion for a preliminary injunction that would require IPD to produce detailed contact information for each of its subscribers, authorize Cheney to contact those entities, and further declare that Cheney may solicit IPD's current and former employees to join him in a legal practice in competition with IPD.  <u>See</u> Pl.'s Mot. for Prelim. Inj. at 1-2.  In response, defendants have moved to dismiss this action, or in the alternative to transfer, on the grounds of improper venue and lack of personal jurisdiction.  <u>See</u> Defs.' Mot. to Dismiss at 1.  A hearing on the motions was held on September 26, 2008.  For the reasons explained below, the Court will grant defendants' request to transfer this action to the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1404(a), and deny Cheney's motion for preliminary injunction without prejudice.

## BACKGROUND[1]

IPD is a Florida company engaged in the business of publishing and selling a subscription to institutional investors, known as "Wall Street newsletters," providing research reports and analyses of patent litigation involving public companies for investment purposes.  See First Krass Decl. ¶¶ 2, 7; First Cheney Decl. ¶¶ 5, 9.  To that end, IPD recruits patent attorneys to provide analyses of patent litigation, typically lawyers who have served as law clerks on the U.S. Court of Appeals for the Federal Circuit.  Second Cheney Decl. ¶ 5.  Krass recruited Cheney, a former Federal Circuit law clerk, in late 2005 and early 2006 to join IPD.  Second Cheney Decl. ¶ 1. Cheney was then an associate at Dewey Ballantine LLP in the District of Columbia, and on track to become a partner.  See First Cheney Decl. ¶ 4.  In January 2006, Cheney traveled to the Company's office in Bay Harbor Islands -- a suburb of Miami -- for a multi-day interview with Krass and IPD's director, Mark Mamolen.   Compl. ¶ 15.

By email dated February 3, 2006, captioned "Offer of Employment," Krass offered Cheney a position as an analyst with IPD, and set forth the following salary package: a base salary of $200,000 per year, payment of moving expenses up to $10,000, a signing bonus of $10,000, a bonus of $20,000 if he purchased a full-time residence in Florida, a performance-

---

[1]   The facts summarized in this section are not in dispute, except where noted.  For ease of reference, the Court will refer to defendants' memorandum in opposition to Cheney's motion for preliminary injunction as "Defs.' Opp'n," and to defendants' memorandum in support of their motion to dismiss as "Defs.' Dismissal Mem."  Cheney's memorandum in opposition to defendants' motion to dismiss will be referred to as "Pl.'s Opp'n."  The Court also observes that Cheney and Krass have attached multiple declarations in support of their memoranda.  These will be cited as "First Cheney Decl." (ECF Doc. No. 2, filed June 18, 2008), "Second Cheney Decl." (ECF Doc. No. 14-3, filed July 14, 2008), "First Krass Decl." (ECF Doc. No. 12-2, filed July 9, 2008), and "Second Krass Decl." (ECF Doc. No. 16-2, filed July 24, 2008).  The Court will refer to the multiple copies of Cheney's Employment Agreement and the boilerplate subscription agreements simply as the Employment Agreement and the Subscription Agreement.

based bonus of $50,000 for calendar year 2006, future annual bonuses in an amount to be determined, and health and disability insurance. See First Cheney Decl., Ex. C ("Offer of Employment"). The offer further stated: "It is contemplated that in the event you achieve a performance level comparable to the other Company Analysts, as part of your bonus package for calendar year 2007, the Company will provide an opportunity for you to obtain equity in the Company that would vest over subsequent years." Id. The offer concluded with the qualification that "[y]our employment pursuant to this offer is contingent on your execution of an Employment Agreement which is a condition of this offer and of your continued employment with the Company." Id.

Cheney accepted minutes later, writing from the District of Columbia:

> Dear Howard,
>
> It is my honor to accept your offer as described in your message below. Thanks very much for your effort in putting it together. I'm excited to dig into the work at IPD Analytics, I'm excited to join the team that you have assembled, and I'm looking forward to getting to know you better as we work together.

First Cheney Decl., Ex. C. In response, Krass promised to "send . . . the Employment Agreement on Monday." Id. Cheney signed the Employment Agreement three days later while still in the District of Columbia. Second Cheney Decl. ¶ 2. Krass signed the Agreement in Florida on March 6, 2006. Employment Agreement at 4.

The Employment Agreement contains three paragraphs whose purpose is to prevent Cheney from competing with IPD in the event of his departure: a confidentiality provision, a non-competition provision, and a non-solicitation provision. They state, in relevant part:

> 1.2  Confidential Information.  As used herein, the term "**Confidential Information**" means all information of a confidential nature . . . which is not generally known to the public and which relates to the business of the Company,

including without limitation . . . client lists. . . .  Employee acknowledges that the business of the Company is highly competitive and that the services to be performed by Employee for the Company are unique . . .  Employee will hold all Confidential Information in strictest confidence and will:

> (a) not . . . use . . . any Confidential Information other than as necessary for Employee's performance of Employee's responsibilities as an employee of the Company . . .

> Employee also agrees that in connection with this Section 1.2, Employee also will be bound by the provisions of Section 1.4.  Employee further acknowledges and agrees that the Company's conduct in providing Employee with Confidential Information . . . gives rise to the Company's interest in restraining employee from competing against the Company as set forth in Section 1.4, and that Employee's agreement in Section 1.4 is designed to enforce Employee's agreement in this Section 1.2.

1.4 Non-Competition.  Employee agrees that during the Employment Term and for a period of one (1) year thereafter, for any reason, Employee will not, directly or indirectly, in any State of the United States, or any country in the world where the Company engages or proposes to engage in Business . . . (i) become employed by . . . or in any other way provide services that compete with the Company's Business for any entity that was a customer of the Company at any time during the Employment Term, (ii) compete with the Company in Business, or (iii) participate in the ownership, management, operation, financing, or control of, or be employed by or consult for or otherwise render services to, any . . . entity that competes with the Company in Business.  For the purposes of this Section 1.4, **"Business"** shall mean (x) providing or planning to provide research and/or analysis, for investment purposes, of pending litigation and/or intellectual property issues, throughout the United States or in any country in the world, and (y) any other portion of the Company's business in which Employee actively participated or regarding which Employee received Confidential Information . . . .

1.5 Non-Solicitation/Non-Hire of Employees.  Employee agrees that, during the Employment Term and for a period of two (2) years thereafter, Employee shall not . . . (a) solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by . . . the Company, or (b) otherwise interfere with the relationship between any such person and the Company.

Employment Agreement ¶¶ 1.2, 1.4 and 1.5 (emphasis in original).  The Employment Agreement further includes a forum selection clause to provide for exclusive venue in Florida for any litigation arising out of the Agreement:

> Any litigation or arbitration between the parties which arises out of this Agreement shall be instituted and prosecuted only in the appropriate state or federal court or other tribunal situated in Miami, Florida.  Parties hereby submit to the exclusive jurisdiction of such courts and tribunals for purposes of any such action and the enforcement of any judgment or order arising therefrom.  Parties hereby waive any right to a change of venue and any and all objections to the jurisdiction of the state and federal courts and other tribunals located in Miami, Florida.

Id. ¶ 1.8.

The Subscription Agreement that subscribers are required to sign also contains a provision that prevents former IPD employees from providing competing services to subscribers during the subscription period or for one year thereafter.  This provision, entitled "Non-Hire," provides that "[d]uring the term of this Agreement and for a period of one year thereafter the Subscriber shall not employ or contract with any current personnel of IPD Analytics or former personnel of IPD Analytics who had been employed by IPD Analytics within the one year period immediately preceding such employment or contract with the undersigned."  Subscription Agreement ¶ 4.  No forum selection clause is contained in this document.

Cheney moved to Florida soon after accepting, and formally commenced working for IPD in March 2006.  First Cheney Decl. ¶ 8.  There were no significant changes in the terms and conditions of his employment until the end of that year.  In December 2006, IPD announced that it was instituting a 401(k) plan ("Plan"), established under a separate Plan document.  Compl. ¶ 28.  The Plan document designated IPD as the Plan Administrator, and Krass as the Trustee.  Id. ¶ 28.  The Plan obligated IPD to match employee contributions using a certain formula and to deposit the matches in a special "safe harbor" account.  Id. ¶ 29.  Cheney allegedly made the maximum contributions in 2006 and 2007; however, he contends IPD failed to make full matching contributions with respect to Cheney and other IPD employees.  Id. ¶¶ 30-33.  In 2008,

IPD allegedly failed to provide Cheney with any matching contributions at all.  Id. ¶ 24.

During Cheney's tenure at IPD, he conducted legal research and wrote reports attempting to predict outcomes of cases, responded to inquiries from subscribers about his reports, and traveled to the District of Columbia to observe Federal Circuit and International Trade Commission hearings.  First Cheney Decl. ¶¶ 9-11; Second Cheney Decl. ¶¶ 12-15.  Cheney performed at an "A+" level while at the Company.  Compl. ¶ 35.

In December 2007, however, the relationship began to deteriorate due to compensation issues.  Krass called Cheney into his office on December 13, 2007 to discuss Cheney's bonus package for the year.  Id.; Second Krass Decl., Ex. 2 (Letter from Cheney to Krass, dated Feb. 15, 2008) ("Cheney Breach Letter").  At that time, Cheney expressed his disappointment that IPD had not complied with its 401(k) matching obligations.  Compl. ¶ 36.  Cheney also informed Krass that he expected to receive equity in IPD as part of his bonus package for calendar year 2007, as provided in the February 3, 2006 Offer of Employment -- which Cheney calls the "equity agreement."  Id. ¶ 37.  In response, Krass told him that he would not grant Cheney equity ownership in IPD, and denied the existence of any equity agreement.  Id. ¶ 38.  Instead, Krass stated his intent to offer Cheney certain "options" in January 2009, retroactive to January 1, 2008.  See Cheney Breach Letter at 1.  Later that day, Cheney provided Krass a copy of the February 3, 2006 email promising him an opportunity to obtain equity in IPD, but Krass refused to acknowledge the document.  Compl. ¶ 39.

Cheney then had two meetings with IPD's director, Mark Mamolen, with Krass's tacit approval -- one on January 17, 2008, and the second on February 7, 2008.  Cheney Breach Letter at 2.  They discussed Cheney's request for an equity interest as well as an alternative profit sharing arrangement proposed by Mamolen.  Id.  No resolution was reached.  Id.  By letter dated

February 15, 2008, Cheney notified Krass that IPD had breached the equity agreement and violated its 401(k) matching obligations, and recounted the details of his meetings with Krass and Mamolen.  Id.  He stated that he had lost trust in IPD, and further stated his intent to "relocate" in early March 2008; however, he emphasized that his letter did not constitute his resignation from IPD.  Id. at 3.  Cheney posted his letter on the Internet the next day, February 16, 2008.  See Second Krass Decl. ¶ 4, Ex. 3.

The following Tuesday, February 19, 2008, Krass intercepted Cheney as he arrived at work.  Compl. ¶ 41.  Cheney was escorted into Krass's office, with another Company employee acting as a witness.  Id. ¶ 42.  Krass informed Cheney that he was being fired for disclosing the information in the February 15 letter.  Id.  Cheney, however, believes he was fired for making allegations that IPD had breached its 401(k) obligations.  Id. ¶ 44.  Cheney left IPD's premises that day (id.); by March 10, he had moved back to the District of Columbia.  See First Krass Decl., Ex. 3.

Cheney filed this lawsuit on June 18, 2008, seeking relief from the provisions of the Employment Agreement and Subscription Agreement that, in his view, improperly prevent him from "providing legal services in competition with Defendants."  Compl. ¶ 1.  To that end, he seeks the following: first, a declaratory judgment recognizing an attorney-client relationship between IPD and its subscribers and declaring that IPD must allow Cheney to contact the subscribers, as his former "clients" (Count One); second, a declaration that the non-competition and non-solicitation paragraphs of the Employment Agreement are unenforceable (Counts Two and Four); and third, a declaration that the non-hire paragraph of the Subscription Agreement is unenforceable (Count Three).  See Compl. ¶¶ 54-75.  He also seeks damages for breach of contract (Count Five), fraudulent inducement (Count Six), and promissory

estoppel (Count Seven) -- all pertaining to Krass's refusal to honor his alleged promise to provide Cheney an equity interest in IPD.  Id. ¶¶ 76-93.  Cheney also brings three claims under the Employment Retirement Income Security Act of 1974 ("ERISA"), relating to IPD's alleged failures to properly implement the 401(k) Plan -- that is, failure to make required employer contributions (Count Eight), breach of fiduciary duty (Count Nine), and failure to roll over Cheney's 401(k) assets to another financial institution (Count Ten).  Id. ¶¶ 94-112.  His final claim is that IPD failed to provide notice concerning his right to continued health plan coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1166 (Count Eleven). Compl. ¶¶ 113-15.

Cheney has filed a motion for a preliminary injunction focusing on his first group of claims (Counts One through Four) seeking relief that would enable him to compete with IPD. See Pl.'s Mot. for Prelim. Inj. at 1-2.  This consists, in the main, of an order requiring IPD to turn over detailed contact information for each of its subscribers and authorizing Cheney to contact those entities, and further declaring that Cheney may solicit IPD's current and former employees to join him in a legal practice.  See Pl.'s Mot. for Prelim. Inj. at 1-2.  Defendants strenuously oppose that motion, arguing that Cheney's premise that IPD's newsletter service constitutes the "practice of law" (or creates an attorney-client relationship) is without merit, comparing IPD's newsletter services to legal analysts on cable news programs.  See Defs.' Opp'n at 1-7; Defs.' Reply at 1-3.  They also argue that this Court should not resolve those merits issues because venue does not lie in this Court and personal jurisdiction is lacking.  See Defs.' Dismissal Mem. at 1-16.  They thus seek dismissal of this action or, in the alternative, transfer to the United States District Court for the Southern District of Florida.  Id. at 16.

## STANDARD OF REVIEW

A defendant may move to dismiss or transfer a case pursuant to Fed. R. Civ. P. 12(b)(3) if venue is improper or inconvenient in the plaintiff's chosen forum.  Generally, the interests of justice require transferring such cases to the appropriate judicial district rather than dismissing them.  Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466- 67 (1962); James v. Booz-Allen & Hamilton, Inc., 227 F. Supp. 2d 16, 20 (D.D.C. 2002).  Even if the venue chosen by the plaintiff is valid, a court is still authorized to transfer the case to another jurisdiction "[f]or the convenience of parties and witnesses, in the interest of justice," under 28 U.S.C. § 1404(a).[2]  The decision whether transfer is "in the interest of justice" is committed to the sound discretion of the district court.  Naartex Consulting Corp. v. Watt, 722 F.2d 779, 789 (D.C. Cir. 1983).  Unless there are pertinent factual disputes to resolve, a challenge to venue presents a pure question of law.

Courts have discretion to resolve issues such as venue that do not affect the merits of the case, without deciding the matter of personal jurisdiction.  See Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 127 S. Ct. 1184, 1188 (2007) ("a district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and . . . need not resolve whether it has authority to adjudicate the cause . . . or personal jurisdiction"); Public Citizen v. U.S. District Court for the Dist. of Columbia, 486 F.3d 1342, 1348 (D.C. Cir. 2007) ("Sinochem . . . firmly establishes that certain non-merits, nonjurisdictional issues may be addressed preliminarily, because '[j]urisdiction is vital only if the court proposes to issue a judgment on the merits.'")

_____

[2] Section 1404(a) states in full:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

(quoting <u>Sinochem</u>, 127 S. Ct. at 1191-92).  In this case, the interests of judicial economy as well as prudential concerns weigh in favor of resolving the issue of venue at the outset.  Even if the Court sorted through the many and complex personal jurisdiction issues raised by defendants, it would ultimately remain necessary to address transfer of venue under section 1404(a) in light of the forum selection clause in the Employment Agreement and the strong connection of this action to Florida.[3]

## DISCUSSION

Defendants contend  that the exclusive forum for litigating the issues raised by Cheney is a "state or federal court . . . situated in Miami, Florida," pursuant to the forum selection clause in the Employment Agreement.  <u>See</u> Defs.' Dismissal Mem. at 2-5.  Hence, they request that this action be dismissed or, in the alternative, transferred to the Southern District of Florida.  Cheney responds that the forum selection clause should not be enforced and, in any event, does not cover the claims he has raised.  Pl.'s Opp'n at 19-32.  He also contends that even if the forum selection clause is valid, the factors set forth in 28 U.S.C. § 1404(a) weigh in favor of keeping the case in this district.  <u>Id.</u> at 25-27.  The Court must resolve the threshold issue concerning the validity and applicability of the forum selection clause before deciding the weight it should be given in determining venue.  For the reasons set forth below, the Court holds that the forum selection clause is valid and covers most of the claims alleged in Cheney's complaint, and furthermore, that under section 1404(a), the case should be transferred to the Southern District of Florida.

---

[3]  Both the general venue provision and the ERISA venue provision are implicated in this case.  Each of these statutes provides that venue is proper in a judicial district in which any defendant is subject to personal jurisdiction, in addition to other circumstances.  <u>See</u> 28 U.S.C. § 1391(b); 29 U.S.C. § 1132(e)(1).  For the purpose of evaluating defendants' motion to transfer this action to the Southern District of Florida based on the forum selection clause, the Court will assume without deciding that venue would otherwise lie in this District.

I.      **Enforceability of the Forum Selection Clause**

The Supreme Court held in <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 10-12

(1972), that a forum selection clause is "prima facie" valid absent some "compelling and

countervailing reason" for setting it aside.  Although <u>The Bremen</u> was decided in the context of

admiralty law, its principles concerning the validity of a forum selection clause have been widely

applied in diversity of citizenship and federal question cases.  <u>See</u>, <u>e.g.</u>, <u>Commerce Consultants</u>

<u>Int'l, Inc. v. Vetrerie Riunite, S.p.A.</u>, 867 F.2d 697, 699 (D.C. Cir. 1989); <u>Phillips v. Audio</u>

<u>Active, Ltd.</u>, 494 F.3d 378, 384 (2d Cir. 2007); <u>Gipson v. Wells Fargo & Co.</u>, 563 F. Supp. 2d

149, 155 (D.D.C. 2008).  <u>The Bremen</u> explained that a forum selection clause will be considered

valid unless the party opposing the clause makes a "strong showing" that (1) "enforcement would

be unreasonable and unjust"; (2) "the clause was invalid for such reasons as fraud or

overreaching"; (3) "enforcement would contravene a strong public policy of the forum in which

suit is brought, whether declared by statute or judicial decision"; or (4) "trial in the contractual

forum would be so gravely difficult and inconvenient that [the plaintiff] will for all practical

purposes be deprived of his day in court."  407 U.S. at 15, 18; <u>see also</u> <u>Commerce Consultants</u>

<u>Int'l</u>, 867 F.2d at 699 (recognizing that a forum selection clause is prima facie valid unless one of

the <u>The Bremen</u> exceptions applies).

Cheney contends that the forum selection clause is not enforceable as a threshold matter,

invoking all four of the foregoing <u>Bremen</u> exceptions, and thus urges the Court to give the clause

no weight in determining the proper venue under section 1404(a).  <u>See</u> Pl.'s Opp'n at 27-32.

First, Cheney contends that the clause is invalid because he was induced to leave his law firm by

a fraudulent promise of an equity interest in IPD and, hence, the execution of the Employment

Agreement was the result of fraud.  <u>See</u> Pl.'s Opp'n at 30.   He further alleges that the forum

11

selection clause constitutes overreaching because it makes "it more difficult for an attorney

leaving their employ[ment] and jurisdiction to bring Defendants to account for their actions." Id.

at 32.  Those allegations are plainly insufficient to invalidate the forum selection clause.  "Fraud

and overreaching must be specific to a forum selection clause in order to invalidate it."

Haynsworth v. The Corporation, 121 F.3d 956, 963 (5th Cir. 1997).  As the Fifth Circuit has

explained:

> The Bremen's exception for unreasonable fraud or overreaching "does not mean
> that any time a dispute arising out of a transaction is based upon an allegation of
> fraud . . . the clause is unenforceable.  Rather, it means that a . . . forum-selection
> clause in a contract is not enforceable if the inclusion of that clause in the contract
> was the product of fraud or coercion."

Id. (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974) (emphasis in

original)); accord 2215 Fifth Street Associates, LP v. U-Haul Int'l, Inc., 148 F. Supp. 2d 50, 55

(D.D.C. 2001); Marra v. Papandreou, 59 F. Supp. 2d 65, 71 n.3 (D.D.C. 1999), aff'd, 216 F.3d

1119 (D.C. Cir. 2000).  Therefore, a forum selection clause would be invalid "if it had been

concealed by one party or if an overbearing party had forced a relatively unsophisticated party to

include it within the contract."  2215 Fifth Street Associates, 148 F. Supp. 2d at 55.  Here,

Cheney makes no allegation that the forum selection clause was concealed or that he agreed to

the clause as a result of coercive tactics by defendants.  Instead, he alleges more broadly that

defendants committed fraud in persuading him to enter into an employment relationship with

them.  Moreover, Cheney's allegation of coercion is undermined by the fact that he is an

experienced attorney, one who was on a partnership track at a major law firm.  See id. at 55

(observing that, even if parties are of "unequal bargaining power," coercion will not be found

where "the choice of forum was made in an arm's length negotiation by experienced

businessmen"); Marra, 59 F. Supp. 2d at 71 & n.4 (noting that "superior bargaining power" held

12

by one party is insufficient to find duress where advice of counsel was available to each side); see also Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593-95 (1991) (holding that lack of negotiations over a forum selection clause in a form passenger contract did not diminish its validity). Indeed, a review of the emails between Cheney and Krass during the recruitment period shows no hint of coercion, but instead confirms their relative equal bargaining power.

Cheney's contention that enforcement of the forum selection clause will deprive him of his day in court also fails. He refers to his status as a pro se litigant, and asserts that he faces financial hurdles in pursuing this case in Florida because he has not had income for "several months" and cannot afford to travel to Florida to prosecute this suit. But the record demonstrates that Cheney had over $577,000 in income from February 2006 through February 2008. See Second Krass Decl. ¶ 3. Indeed, at the motions hearing, Cheney virtually conceded that he does not presently claim a financial inability to pursue his case in Florida.[4] See Mot. Hr'g Tr. at 58. Furthermore, as noted above, he is an experienced attorney who is amply qualified to pursue his case in another federal district court such as the Southern District of Florida.

This leaves, then, his argument that the forum selection clause should not be enforced because it is unreasonable and would "contravene a strong public policy" of his chosen forum, the District of Columbia. Cheney contends that the resolution of his claims -- in particular, the enforceability of the non-competition provision of the Employment Agreement -- affects the right of clients to choose counsel of their choice and the right of members of the D.C. Bar to practice law. Pl.'s Opp'n at 27-28. In his view, the District has a strong public policy interest in

---

[4] Cheney also has not demonstrated that the expenses of litigating in Florida are prohibitively high. Travel expenses, for example, are unlikely to preclude him from pursuing his case, considering that substantial aspects of the litigation can be pursued through the electronic case filing system known as CM/ECF.

13

protecting those rights, which will not be adequately protected in Florida courts that, allegedly, are more likely to enforce non-compete clauses and take a narrower view of the attorney-client relationship.  Id.

But Cheney's premise -- that he had an attorney-client relationship with each subscriber to the IPD newsletter, under either District of Columbia or Florida law -- is questionable at best.[5] Even assuming that the District has a broader view of attorney-client relationships, moreover, "the mere belief that the chosen forum has unfavorable precedents cannot be the basis for avoiding a forum selection clause."  See Gipson, 563 F. Supp. 2d at 155.  Such an approach would require every court to decide the merits of a case before deciding whether transfer of venue is warranted, but The Bremen certainly does not impose such a requirement.  Furthermore, an allegation that the proposed transferee court will not fully consider the interests of nonresidents or that it will simply reach a resolution unfavorable to plaintiff falls far short of a

---

[5]  Cheney believes he had an attorney-client relationship with subscribers because he prepared legal analyses predicting the likely outcomes of patent cases and, hence, engaged in the "practice of law."  However, there is nothing in the record to indicate that subscribers to IPD newsletters relied on those analyses to determine their rights and obligations under the law, in contrast to investment decisions.  Indeed, all indications are to the contrary.  See, e.g., Defs.' Opp'n, Ex. B (affidavit of subscriber Howard Singer stating that IPD Analytics does not represent his company as counsel); Subscription Agreement ¶ 3 (notifying subscribers that IPD Analytics does not serve as their attorney and circulates its reports to multiple subscribers); Employment Agreement ¶ 1.4 (describing IPD's "Business" as providing "research and/or analysis, for investment purposes, of pending litigation and/or intellectual property issues") (emphasis added). A relationship of trust and reliance with respect to a determination of the client's legal rights and obligations is central to the concept of the "practice of law" and the attorney-client relationship in both Florida and the District of Columbia.  See Florida Bar re Advisory Opinion, 681 So. 2d 1119, 1123 (Fla. 1996) (explaining that the "practice of law" depends on "the giving of legal advice and counsel to others as to their rights and obligations under the law and the preparation of legal instruments . . . by which legal rights are either obtained, secured or given away") (quoting State ex rel. Florida Bar v. Sperry, 140 So. 2d 587, 591 (Fla. 1962)); D.C. App. R. 49(b) (defining the "practice of law" as "the provision of professional legal advice or services where there is a client relationship of trust or reliance" and listing activities that are presumptively covered if "conducted on behalf of another") (emphasis added).

showing of an "immoral or illegal result" that would violate public policy.  See Omron

Healthcare, Inc. v. Maclaren Exports, Ltd., 28 F.3d 600, 603 (7th Cir. 1994) (observing that

"[p]ublic policy arguments depend on the fact 'no court will lend its aid to one who founds a

cause upon an immoral or illegal act,'" and rejecting plaintiff's contention that litigating in

England pursuant to a forum selection clause would have "immoral or illegal" results because

English courts would not have "the interests of Americans at heart"); Manetti-Farrow, Inc. v.

Gucci America, Inc., 858 F.2d 509, 515 (9th Cir. 1988) (rejecting plaintiff's contention that

"enforcement of the clause would be unreasonable because it cannot be assured that an Italian

court will adequately safeguard its rights," noting that "[t]his concern is not only speculative, it

'reflects something of a provincial attitude regarding the fairness of [the other] tribunal'").

Defendants' proposed venue is the Southern District of Florida, and it strains credulity to submit

that litigating in another federal judicial district would result in an "immoral or illegal" result.

That court is eminently capable of fairly addressing the issues raised by Cheney -- including his

request to consider the impact of the non-compete clause on his ability to practice law in the

District of Columbia.

Finally, it bears noting that there are "public policy" considerations weighing in favor of

upholding the forum selection clause.  Numerous courts have expressed concern that disregard of

forum selection clauses will inhibit "the expansion of American business and industry."

Commerce Consultants Int'l, Inc., 867 F.2d at 700 (quoting The Bremen, 407 U.S. at 9); Omron

Healthcare, Inc., 28 F.3d at 603 ("the "dominant policy" in cases involving a forum selection

clause is to enforce the parties' agreement "the better to promote commerce"); 2215 Fifth Street

Associates, 148 F. Supp. 2d at 54 (observing that "present day commercial realities and

expanding international trade" underlie the presumptive validity of forum selection clauses).

15

In short, the presumptive validity of the forum selection clause applies in this case because the clause was not the result of fraud or overreaching and does not deprive Cheney of his day in court, nor does it violate any public policy.  The validity of the clause, however, is only the beginning of the analysis.  The Court must now determine whether the forum selection clause covers the claims raised by Cheney, and then whether balancing the factors under section 1404(a) favors transfer of this action.

## II.   Applicability of the Forum Selection Clause to Cheney's Claims

Cheney contends that the forum selection clause, even if valid, should not affect venue because most of the claims are not covered by the clause.  Defendants respond that he construes the clause too narrowly and that all of his eleven claims are covered by the clause.

The Court starts with the language of the forum selection clause.  It states, in relevant part:

> Any litigation or arbitration between the parties which arises out of this Agreement shall be instituted and prosecuted only in the appropriate state or federal court or other tribunal situated in Miami, Florida.  Parties hereby submit to the exclusive jurisdiction of such courts and tribunals for purposes of any such action . . . .

Employment Agreement ¶ 1.8.  The parties agree that the key words in determining the type of claims covered are "arises out of this Agreement."

Cheney contends that the reference to "this Agreement" excludes the written offer of employment made by Howard Krass on February 3, 2006 and is limited to the four-page Employment Agreement document.  Pl.'s Opp'n at 22-23.  He bases this conclusion on the Employment Agreement's reference to the offer letter as "separate" and on its introductory statement that it will be cited thereafter as "the Agreement."  But as defendants correctly point out, the Employment Agreement incorporates the offer letter.  See Defs.' Dismissal Mem. at 4-5.

16

The Employment Agreement states at the outset that "the Company desires to retain Employee as an employee of the Company, and Employee desires to be so employed by the Company, subject to the terms, conditions and covenants set forth in a separate offer letter and additionally in this Agreement." Employment Agreement at 1. It then defines the "Entire Agreement" as consisting of "[t]his Agreement, the Offer Letter, and the Recitals." Id. at 2. Moreover, the offer letter makes clear that it is one piece of the Employment Agreement that is to follow, rather than a stand-alone agreement. See Offer of Employment at 1-2. Thus, the employment offer "is contingent on your execution of an Employment Agreement which is a condition of this offer and your continued employment with the Company." Id. at 2 (emphasis added). Indeed, it is hard to conceive of any employment agreement that would not consist of at least an offer of employment and acceptance. Here, the four-page Employment Agreement makes clear that the unlikely dichotomy of an employment agreement that is not linked to an accepted offer is not present. Therefore, the Court concludes that the forum selection clause, properly construed, covers litigation arising out of "the Agreement," which encompasses the February 16, 2006 offer letter.

To determine whether Cheney's claims are covered by the forum selection clause, the Court must also assess the meaning of the phrase "arising out of." Cheney contends that the phrase must be construed narrowly, and that it refers only to claims that "originate" from the Agreement, in contrast to claims that "relate to" or have some "connection" with the Agreement. See Pl.'s Opp'n at 20 (citing Phillips v. Audio Active, Ltd., 494 F.3d 378, 389 (2d Cir. 2007)). Defendants accept that formulation but contend that even using an "origination" standard, all of Cheney's claims originate from the Agreement. See Mot. Hr'g Tr. at 23-24.

Substituting "originate" for "arising out of" is of little use in construing the scope of the

17

forum selection clause because it simply substitutes a synonym.  The Court finds more

instructive the body of cases that have construed the phrase "arising out of," although these, too,

are not conclusive considering the various formulations of how the phrase should be construed.

A consensus on a few general principles can, however, be found.  First, in determining whether a

claim "arises" out of a contract, one must "examine the substance of [the] claims shorn of their

labels," and "focus on factual allegations rather than on the causes of action asserted."  Phillips,

494 F.3d at 388; accord Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360-61 (2d Cir. 1993); see

also Worldwide Network Servs., LLC v. Dyncorp Int'l, 496 F. Supp. 2d 59, 63 (D.D.C. 2007)

("strategic or artfully drawn pleadings will not be permitted to circumvent an otherwise

applicable forum selection clause").  Hence, the mere fact that a plaintiff has pled his claim as a

tort or a violation of federal statute does not determine whether the claim "arises" from the

contract.  Phillips, 494 F.3d at 388.

   The Eighth Circuit has observed that three guiding principles from cases in the First,

Third and Ninth Circuits are instructive in determining whether claims "arise" from a contract.

Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 693-94 (8th Cir. 1997).  A claim may

"arise under" a contract (1) where the claim "'ultimately depend[s] on the existence of a

contractual relationship between the parties'"; (2) "'resolution of the claims relates to

interpretation of the contract'"; or (3) "'contract-related tort claims involv[e] the same operative

facts as a parallel claim for breach of contract.'"  Id. at 694 (quoting Coastal Steel Corp. v.

Tilghmann Wheelabrator Ltd., 709 F.2d 190, 203 (3d Cir. 1983); Manetti-Farrow, Inc. v. Gucci

America, Inc., 858 F.2d 509, 514 (9th Cir. 1988); and Lambert v. Kysar, 983 F.2d 1110, 1121-22

(1st Cir. 1993)); accord  Worldwide Network Servs., 496 F. Supp. 2d at 62; Gullion v. JLG

Serviceplus, Inc., Civil Action No. H-06-1015, 2007 WL 294174, at * 5 (S.D. Tex. Jan. 29, 2007).  This is consistent with the Second Circuit's observation in Phillips that whether one or another claim "arises out of" or "originates" from a contract depends on whether there is a "causal connection" between the claim and the contract based on rights, duties, or injury flowing from the contract.  Phillips, 494 F.3d at 389, 392.  The Court will apply these principles as it examines whether each of Cheney's eleven claims "arises out of" the Agreement.

There is no dispute that Counts Two and Four arise from the Agreement, as each mounts a direct challenge to the enforceability of two paragraphs of the Employment Agreement -- that is, the non-competition and non-solicitation provisions -- on the ground that they unlawfully limit Cheney's ability to practice law and contact his former clients (the subscribers).  See Compl. ¶¶ 61-64, 71-77.  Count Five alleging breach of contract is based on defendants' refusal to grant him an opportunity to obtain equity ownership in IPD as indicated in the employment offer.  This claim, too, "arises out of" the Employment Agreement, notwithstanding Cheney's attempt to characterize the employment offer and his acceptance as a separate freestanding agreement.  As discussed above, the employment offer was integrated into the Employment Agreement. Whether the remaining claims arise from the Agreement is less obvious, but with the exception of three of the ERISA claims, close examination reveals that they, too, originate in the Agreement.

Count One seeks a "declaratory judgment of attorney-client obligations" -- that is, that an attorney-client relationship exists between Cheney and IPD subscribers -- and in particular, a declaration that "[d]efendants' refusal to allow Mr. Cheney to contact [IPD] clients violates Florida Rules of Professional Conduct 5.6 and 5.8 and other similar rules in other jurisdictions."

Compl. ¶¶ 55-60.  Although Count One does not refer to the Employment Agreement, the

confidentiality and non-competition paragraphs of the Agreement are the sources of the alleged

restriction on Cheney's contact with IPD subscribers alleged in Count One.  See Employment

Agreement ¶ 1.2 (prohibiting Cheney from using "Confidential Information," including client

lists, "other than as necessary for [the] performance of [his] responsibilities as an employee"); id.

¶ 1.4 (prohibiting Cheney from "compet[ing] with the Company in Business").  Furthermore,

resolution of the attorney-client relationship issue raised by Count One is grounded in the same

inquiry as that raised by the counts directly challenging the non-competition and non-solicitation

provisions of the Employment Agreement -- that is, whether IPD is engaged in the practice of

law and has formed attorney-client relationships with its subscribers.   Thus, the controversy over

the restrictions on contact with IPD subscribers or clients originates in the Employment

Agreement.  And the relief Cheney seeks under Count One -- access to IPD client lists -- is itself

prohibited by the Employment Agreement.  See Employment Agreement ¶ 1.2 (preventing

disclosure of client lists as "confidential information").  Therefore, the resolution of Count One

requires interpretation of the non-competition, non-solicitation, and confidentiality provisions of

the Employment Agreement.[6]  In light of these considerations, the Court concludes that Count

One arises out of the Employment Agreement.

Count Three seeks a declaratory judgment that the non-hire paragraph of the Subscription

Agreement between IPD and its subscribers is unenforceable.  Cheney alleges that, although he is

---

[6] For example, the "Business" within which Cheney is restricted from competing is
defined primarily as "providing or planning to provide research and/or analysis, for investment
purposes, of pending litigation and/or intellectual property issues, throughout the United States or
in any country in the world."  Employment Agreement ¶ 1.4.  The Court would be called upon to
determine under Count One whether that "Business," as implemented during Cheney's tenure,
gave rise to an attorney-client relationship.

not a party to this contract, it should be held unenforceable on the ground that it restricts his ability to communicate with IPD subscribers and, hence, like the non-competition clause, ostensibly violates ethical rules governing attorneys and the practice of law.  See Compl. ¶¶ 66-68.  The requested remedy for this restriction is not only a declaration that the non-hire paragraph is unenforceable, but disclosure of IPD's subscriber lists, including detailed contact information. See Compl. at 21-22.  But Cheney's stake in the non-hire paragraph of the Subscription Agreement exists only because he is prohibited by the Employment Agreement from competing with IPD in its "business."  Thus, resolution of the enforceability of the non-hire paragraph turns on whether IPD's "business" -- as defined in the Employment Agreement -- constitutes the practice of law.  And, like Count One, the relief he seeks under Count Three -- access to IPD client lists -- is itself prohibited by the Employment Agreement.  See Employment Agreement ¶ 1.2.  These considerations indicate that Count Three depends on the nature of the contractual relationship between Cheney and IPD, and involves the same operative facts as his parallel claims challenging the Employment Agreement.  See Terra Int'l, 119 F.3d at 693-94 (observing that a non-contract claim "arises under" a contract where the claim "'ultimately depend[s] on the existence of a contractual relationship between the parties" or "involves the same operative facts" as a breach of contract claim).  Interpretation of the terms of the non-competition paragraph of the Employment Agreement also would be necessary.  Hence, the Court concludes that the claim in Count Three, and its resolution, is appropriately viewed as arising out of the Employment Agreement.

The Court next considers whether the tort claims -- fraudulent inducement (Count Six) and promissory estoppel (Count Seven) -- "arise out of" the Employment Agreement.  Both

claims focus on Krass's alleged promise to give Cheney an opportunity to obtain equity ownership in IPD as part of the employment offer dated February 3, 2006.[7]  See Compl. ¶¶ 81-93.  The existence of a duty to provide Cheney any equity in the company is determined by the Employment Agreement, of which the employment offer is an integral part.  In other words, the tort claims depend on the duties created by the Employment Agreement and require interpretation of whether an equity interest is owed under that Agreement and the integral employment offer.  Therefore, Cheney's labeling of the claims as "fraudulent inducement" and "promissory estoppel" does not shield those tort claims from coverage by the forum selection clause.  Where the "contract is the basic source of [the defendant's] duty to [plaintiff]," the tort claim "arises" from the contract.  See Coastal Steel, 709 F.2d at 203; see also  Furbee v. Vantage Press, Inc., 464 F.2d 835, 836 (D.C. Cir. 1972) (holding that claim of fraudulent inducement was covered by a forum selection clause encompassing "matters arising out of or pertaining to this contract").

The pleading of tort claims is a strategy frequently employed in an attempt to avoid the sweep of a forum selection clause.  See Terra Int'l, 119 F.3d at 693 (reviewing cases and noting that "the majority of these cases suggests that such clauses do apply to tort claims").  Of course, tort claims will not necessarily arise from a contract simply by virtue of a contractual relationship between parties.  See Armco, Inc. v. North Atlantic Ins. Co., Ltd., 68 F. Supp. 2d 330, 334, 339-40 (S.D.N.Y. 1999) (holding that a wide-ranging conspiracy to defraud plaintiff did not "arise" from a sale contract, which was only one piece of the conspiracy).  But in this case IPD's alleged

---

[7]  The fraudulent inducement claim relies additionally on the allegation that IPD represented to Cheney that it had a written opinion from IPD counsel that its business did not constitute the practice of law.  Compl. ¶ 82(a).  Whether IPD's business -- and Cheney's employment -- constituted the practice of law is the same issue underlying the other claims that the Court has determined are covered by the Employment Agreement.

failure to provide an equity interest to Cheney is well within the matters covered by the Employment Agreement and the integrated employment offer.

What remains, then, are the four ERISA claims (Counts Eight through Eleven), which focus on defendants' alleged failure to make adequate contributions on Cheney's behalf to IPD's 401(k) plan, failure to transfer his 401(k) funds to a different bank upon his termination, and failure to provide notice of his rights to continued health care coverage under COBRA, 29 U.S.C. § 1166.  Looking first at the COBRA claim, the Court determines that it "arises out of" the Employment Agreement because IPD's offer of employment promised a health care plan as part of the benefits package; hence, the extent of IPD's obligation to provide notice of rights to continued coverage as a former employee can reasonably be said to "arise out of" the Agreement. The fact that the COBRA notice requirement is a federal statutory right does not exempt it because, as discussed above, courts look at the substance of the claims as they relate to the language of the clause to determine whether a claim is covered by a forum selection clause.  See Phillips, 494 F.3d at 388-89 ("federal courts have routinely rejected [the] suggestion that a claim arising under a law of the United States is exempt from provisions governing disputes between contracting parties").

The claims concerning defendants' actions under the 401(k) plan, however, stand in a different stead.  There is no mention of retirement benefits in the Employment Agreement or the integrated offer of employment.  In fact, the IPD 401(k) plan was instituted in December 2006, long after those documents were exchanged and signed.  See Second Cheney Decl. ¶ 4.  Not surprisingly, the administration of the 401(k) plan, including benefits due thereunder, is set forth in a separate document that  makes no reference to the Employment Agreement.  Because the

23

parties did not contemplate 401(k) benefits at the time they entered the Employment Agreement, and did not modify the Agreement thereafter to encompass the matter of retirement benefits, the claims pertaining to the 401(k) plan do not "arise out of" the Agreement.  The Court will weigh this circumstance as it considers whether the case should be transferred to the Southern District of Florida under the broader section 1404(a) analysis.

**III.     Weight of the Forum Selection Clause under Section 1404(a)**

Having determined that the forum selection clause is valid and applicable to eight of the eleven claims raised by Cheney, the Court next considers whether the applicability of the forum selection clause ends the venue inquiry, or whether venue must be determined based on the balancing of factors set forth in 28 U.S.C. § 1404(a).  In Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 32 (1988), the Supreme Court rejected the position that a forum selection clause is dispositive of venue, and held that "28 U.S.C. § 1404(a) governs the [d]istrict [c]ourt's decision whether to give effect to the parties' forum-selection clause" in determining whether to transfer a case to another judicial district.  The Supreme Court explained that a forum selection clause "represents the parties' agreement as to the most proper forum" and "should receive neither dispositive consideration . . . nor no consideration but rather  the consideration for which Congress provided in § 1404(a)."  Id. at 31.  This means that factors distinct from the parties' agreement -- "convenience of witnesses" and the overall "interest of justice" -- also must considered.  Id. at 30-31.  At the same time, the Supreme Court emphasized that "the presence of a forum-selection clause . . . will be a significant factor that figures centrally in the district court's calculus."  Id. at 29.

Defendants' primary authority for giving dispositive weight to the forum selection clause, without any further inquiry into other factors, is the Supreme Court decision in The Bremen, 407

U.S. at 10.  As discussed earlier, there the Supreme Court held, in the admiralty law context, that a forum selection clause is prima facie valid and enforceable unless enforcement is "unreasonable" under the circumstances.  Id.  After The Bremen, many federal courts have treated a valid forum selection clause as dispositive of venue in federal civil actions, even after Stewart Organization.  See Worldwide Network Servs., LLC, 496 F. Supp. 2d at 62 (citing cases).  However, as the Second Circuit has recognized, Stewart Organization clarified that "outside the admiralty realm" the weight due a valid forum selection clause must be evaluated pursuant to § 1404(a), and not solely under the standard set forth in The Bremen.  Red Bull Assoc. v. Best Western Int'l, Inc., 862 F.2d 963, 966 (2d Cir. 1988); accord Worldwide Network Servs., 496 F. Supp. 2d at 62; Kotan v. Pizza Outlet, Inc., 400 F. Supp. 2d 44, 47 (D.D.C. 2005).  Hence, the Court will apply the section 1404(a) factors to determine whether transfer to the Southern District of Florida is appropriate.

The first factor -- "the convenience of parties and witnesses" -- weighs in favor of transfer to Florida.  Cheney has conceded that "most of the witnesses" are in Florida.  See Mot. Hr'g Tr. at 58. Indeed, it appears that the only witness in the District is Cheney, in contrast to seven or eight witnesses in Florida.  Id. at 18.

Cheney, of course, prefers to have the case litigated in the District, and contends that, as the plaintiff, his choice of forum should be granted deference.  Although a plaintiff's choice of forum is traditionally given substantial deference, no such deference is due where the plaintiff has agreed to venue elsewhere under a forum selection clause.  See Stewart Organization, 487 U.S. at 29-30 ("The flexible and individualized analysis Congress prescribed in § 1404(a) . . . encompasses consideration of the parties' private expression of their venue preferences.") (emphasis added); Marra, 216 F.3d at 1123 (noting that a forum selection clause represents an

25

"ex ante agreement to waive venue objections to a particular forum"); <u>Sheraton Operating Corp.</u>
<u>v. Just Corporate Travel</u>, 984 F. Supp. 22, 25 (D.D.C. 1997) (explaining that under section
1404(a), "the convenience of the parties . . . is properly within the power of the parties
themselves to affect by a forum selection clause") (citation and internal quotation marks
omitted).  The forum selection clause here was part of an agreement made by two parties of
roughly equal "bargaining power" (<u>see</u> <u>Stewart Organization</u>, 487 U.S. at 29), and the arms-
length bargaining is reflected in the provision of a sizable salary, benefits, and bonuses.  <u>See</u>
Employment Offer at 2 (offering base salary of $200,000 per year, payment of moving expenses
up to $10,000, house-purchase bonus of $20,000, signing bonus of $10,000, performance-based
bonus of $50,000 for 2006, future annual bonuses in an amount to be determined, and health and
disability insurance).  The Court acknowledges that Florida will be a less convenient forum than
the District for Cheney; however, as noted earlier, the inconveniences are unlikely to be
substantial considering his status as an experienced attorney and the conveniences of electronic
filing.

        The "interest of justice" also weighs in favor of transfer to Florida.  Under this prong, the
Court considers "public-interest factors of systemic integrity and fairness," which encompasses
the local interest of a forum in deciding local controversies at home and, relatedly, where the
claim arose.  <u>See</u> <u>Gipson</u>, 563 F. Supp. 2d at 156-57 (quoting <u>Stewart Organization</u>, 487 U.S. at
30).  Central to Cheney's claim is that IPD is engaged in the practice of law in Florida but has
failed to follow ethical rules governing the attorney-client relationship.  This is reflected in the
opening paragraph of his complaint, which states: "This lawsuit arises from Defendants' legal
practice in Florida."  Compl. ¶ 1; <u>see also</u> Pl.'s Opp'n at 30 ("Defendants are practicing law in
Florida . . . None of the IPD Analytics attorneys . . . are members of the Florida bar.").  Florida's

strong interest in the practice of law in <u>Florida</u> by a company and attorneys located there is obvious.  In contrast, the District's interest in this case is much smaller.  IPD has no employees or subscribers in the District, and hence there is no significant concern regarding IPD's alleged practice of law in the District.  <u>See</u> First Krass Decl. ¶¶ 2, 7.  The District's primary interest in this case lies in the allegedly improper restriction on one attorney's ability to contact his supposed former clients.  That interest pales in comparison to Florida's interest in regulating a Florida business that is allegedly engaged in the widespread improper practice of law in that forum.

The central events at issue also occurred in Florida.  Cheney traveled to Florida for a multi-day interview, the Employment Agreement was drafted and finalized there, and it was the primary site of Cheney's day-to-day work for almost two years.  The Agreement allegedly was breached in Florida when Krass refused to provide Cheney an opportunity to obtain an equity interest in the company.  The bulk of the alleged 401(k) violations occurred in Florida when defendants allegedly failed to make required contributions to Cheney's 401(k) account and Cheney then engaged in alleged whistleblowing activities concerning the alleged violations.  Furthermore, the 401(k) plan is administered and managed by IPD in Florida; Krass, a Florida resident, is the sole trustee, and makes all decisions concerning the plan in Florida; and the only outside pension consultant who provides assistance is also located in Florida.  <u>See</u> First Krass Decl. ¶ 13; Second Krass Decl. ¶ 9.  Cheney identifies a handful of events that occurred in the District -- Krass's efforts to recruit him, Cheney's occasional travel to this area to attend Federal Circuit and federal agency hearings in furtherance of IPD business, and his future receipt of 401(k) benefits in the District.  But assuming <u>arguendo</u> that all of those events can be considered

in evaluating the appropriate venue,[8] they are on the periphery of the issues raised by this case, all of which are centered in Florida -- that is, the nature of IPD's business, the two-year employment relationship between IPD and Cheney, the validity of the Employment Agreement and alleged breach thereof, and the proper administration of the 401(k) plan.[9]  Hence, it is readily apparent that Florida has the far greater interest in resolution of this case.

Considering the totality of circumstances, then, the Court concludes that the convenience of the parties and witnesses and the interest of justice strongly favor transfer of this case to the appropriate federal district court in Miami, Florida, which is the United States District Court for the Southern District of Florida.  The forum selection clause plays a significant factor in this determination, consistent with the instruction in Stewart Organization.  However, the Court notes that, even without consideration of that clause, the relevant factors favor transfer of this case to Florida considering that forum's far stronger interest in this controversy and the convenience of the witnesses.  Although Cheney is entitled under the forum selection clause to elect a state court in Miami for this action, he has represented to the Court that, should Florida be determined to be the proper venue, he prefers to pursue this action in the United States District Court for the Southern District of Florida.

---

[8]  Defendants contest the appropriateness of considering these events in a personal jurisdiction analysis, and the Court infers that they would make the same arguments with respect to venue.  See Defs.' Reply Mem. at 15-19.

[9]  Cheney relies heavily on the omission of his ERISA claims from the forum selection clause as a basis for denying transfer of venue to Florida.  But as noted above, the ERISA claims are centered on events and entities in Florida.  Hence, even in the absence of the forum selection clause, consideration of the section 1404(a) factors shows that transfer to Florida is in the interest of justice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court will transfer this action to the Southern District of Florida, Miami Division, pursuant to 28 U.S.C. § 1404(a).  The Court will deny defendants' motion to dismiss for improper venue and their motion for protective order staying discovery, and will deny without prejudice Cheney's motion for preliminary injunction.  A separate order accompanies this memorandum opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:   October 20, 2008